The Honorable, the Judges of the United States Court of Appeals for the Fourth Circuit. Oyez, oyez, oyez. All persons having any manner or form of business before the Honorable United States Court of Appeals for the Fourth Circuit are admonished to draw nigh and give their attention for the Court is now sitting. God save the United States and this Honorable Court. Good morning. Welcome to the Fourth Circuit. Please have a seat. Our argument in our first case, Mahmoud v. McKnight. Mr. Baxter. Good morning, Your Honors. Eric Baxter on behalf of the appellant parents. May it please the Court. Your Honors, there's a long-standing national consensus that elementary age school children should not be exposed to instruction on sexuality and gender without the permission of their parents. And there is no dispute that the pride story books that issue in this case push such matters in a way that violates the religious beliefs of many parents. Ironically, both Maryland law and the board's own policies already require opt-outs as demonstrated by the fact that the school board honored opt-outs all last school year, including in a public promise made to parents on March 22nd that their opt-out rights would be upheld. Now, 10 months later, the board still has no explanation why overnight it withdrew and banned all opt-outs for the pride story books alone and told parents they would not even be... Am I correct here that your challenge is a facial challenge? There are no as-applied challenges here. That's correct, Your Honor. Okay. Now the board, asserting inclusivity, does not dispute that it wants, in its own words, to disrupt students either thinking about these issues and encourage curious exploration about matters... So what ages, that was a little difficult for me to discern here, what ages are you addressing? The story books that are at issue directly at issue in the case apply in grades pre-K through fifth grade, so pre-K could include students who are in their late three and four year olds. Right, right. So, I mean, do we, do you or do we differentiate between the curriculum in pre-K and K and fifth grade? Your Honor, really this is an issue for the parents to decide, under Yoder, for the parents to decide when the exposure violates their religious beliefs, and that's true under the fairly significant precedent that seems to say that the younger the child, the different lens that you examine the curriculum with. It's certainly true that courts have uniformly held that the age could be one consideration, for example, on the strict scrutiny side of the equation in these cases, but in Yoder, for example, we were talking about students who were in high school, who were juniors, I'm sorry, freshmen and sophomores, and the court said that that was still a formative age that required deference to the parents' views on when there was the instruction that would violate the religious beliefs of those students. So, you obviously lean on Yoder a lot, but the Supreme Court hasn't used that very much over the last 50 years. Are there other cases that you think are more on point? I would note that the court has, for example, in the Yoder case, I mean, sorry, in the Espinoza case from just a couple of years ago, reiterated the holding, held the holding in Yoder, but there are multiple paths here to strict scrutiny. There are 60 years of precedent, for example, beginning in cases like Sherbert v. Verner through Carson v. Macon, decided just a year ago, that hold that pressure on individuals. Well, can you get to strict scrutiny until you've shown religious burden? Well, those cases are about burden, those cases indicate that whenever someone is pressured to violate their religious beliefs as a condition of accessing a government benefit, that that is a burden cognizable under the Free Exercise Act. That seems to be one of the difficulties at this stage, is that the record such as it is doesn't have a lot in it. So, what's your best evidence that there is pressure, and I take it this is a form of an indoctrination claim, maybe not, but that there's pressure on a particular age group to change their religious values? Your Honor, it's not, I don't think indoctrination is the right lens to look through this. It's not, and it's not, it doesn't have to be pressure to change their beliefs. Pressure to engage in an activity that violates their religious beliefs is sufficient. So here, parents frequently make religious decisions not to expose their children to certain books or movies or to take them to certain places, and these are the, these parents have made a decision based, if you look, so to point to the specific evidence looking at Joint Appendix 404, the Mahmoud Declaration. The Mahmoud family testified that the Quran specifically prohibits engaging in these types of discussions in a public setting, and there are at 409 states that they have an affirmative duty to teach their view and to preserve a period of innocence for their children, and the Persacks at 414 testified that intentional exposure to these types of teachings is a violation of their religious beliefs. Now, on the other side, we have extensive evidence, actually, in this case that the school board was in, chose these books specifically to already disrupt heteronormative values. That's at 578. Promote curious exploration on these issues. Teachers are instructed to tell students that they're opposing... I think the state response to that, I mean, they speak for themselves, that that's a mischaracterization at this stage. It's there's no proof that these books come off the shelf at this point. I think that's sort of the dilemma we struggle with here, is there sufficient evidence upon which to base a decision? Well, I would note that we are at the preliminary injunction stage, and all of this evidence so far is undisputed. There's nothing in the record that would dispute, and in fact, these documents, the documents at 575, 595, and 601 are all the school board's own documents that they produced specifically in response to objections to the Pride storybooks. Is that point that you're making, I'm curious as to your thoughts on some of the other cases, the school district relies on from Mosette to Fleishfresher to Parker, maybe Parker being the exception to this comment, but it seems like in those other cases, first of all, they're out of the circuit, but to the extent we look at them, they seem different in the sense that there are objectionable readings, but they don't seem connected to a policy of promoting inclusivity in the way this one is. They seem to be books for which there may be religious objections, but they're not connected in the way this is to a policy. Is that fair? That's a fair distinction. In this case, we have actual evidence that the school district believes on these issues, and other contrary beliefs. Those statements... From what I've read on the record, the school board's position is that this is regarding inclusion and respect. Right, and our clients want to promote inclusivity and respect, and school boards across the nation teach inclusivity and respect while still requiring opt-outs or opt-ins for parents who have religious objections. The school board did that all last year. I want to ask you about that too. In terms of the opt-outs, how do you suggest that the school board, I believe they initially allowed the opt-outs, and then they said that the opt-outs, there was a large number of opt-outs, and because this, unlike the Maryland opt-out on the sex education classes, it's in the curriculum. How do you suggest the workability of that? Well, the pride storybooks are also a defined curriculum where it's just as easy to opt out as from any particular health class. I'm not aware of any case where a court has held that, you know, kind of the administrative concerns rise to a level of to satisfy strict scrutiny. To the contrary, in El Centro, for example, and as far back as Sherbert, the Supreme Court has said those kinds of concerns typically don't arise to the level necessary to satisfy strict scrutiny. And here we have one statement after the litigation was filed, no evidence of any concerns before all last year when these opt-outs were offered. One statement after the litigation was filed, that there were dozens of students in one school, which with no explanation of why that was difficult. When we know, for example, that in other contexts under the IDEA, for example, where there is a much more complicated system of opt-outs, that the school manages that just fine. Why would that matter? Let's assume it is, you know, challenging. It seems like that's an too much exercise of religion. Somehow the exercise of religion can be limited. That seems perplexing to me. And that's why, Your Honor, the Supreme Court has said that those types of concerns just don't satisfy strict scrutiny. We look at other cases, for example, in the free speech context. Cases like Tinker versus Des Moines School District, where the court has said that our client students could go into these classrooms in the storybook hour and express contrary points of view that might be even more stigmatizing or more harmful to students, according to the school board. And yet that's clearly protected under the free speech cases. It makes no sense to say that the free exercise class students wouldn't also have the right to just be excused. Counsel, I want to ask you a question about your advancement of the ability to opt out under the sex ed. As I understand your characterization of that, you are suggesting that because you can opt out of sex ed for secular reasons, but you can't opt out of the readings for K through 5 for religious reasons. That somehow is a treatment of secular interests differently and better than religious interests. And it seems to me that at least on that issue, treating secular versus religion, I'm just talking about that issue alone, that I'm not sure how the sex ed opt out provision helps you. Because it seems like both religious interest and secular interest can opt out of sex ed. And both religious and secular viewpoints, at least now, cannot opt out of the K through 5 readings. So I'm having trouble understanding how the sex ed helps your argument that secular interests are treated better than religious interests. I would refer your honor to the Supreme Court's decisions in Tandon and Lukumi. So Tandon said you just look at the underlying interest and anything that undermines that interest, whether for secular or even for religious reasons under Lukumi, then you have to allow opt outs in other contexts that would also undermine that interest. And here there's no dispute that both the inclusivity portions of the sex ed class and the pride storybooks were equity regulation, which was designed to promote equity on a number of bases, including sexual orientation and gender identity. And Lukumi is a good example, because in that case, you had exemptions that were imposed by state law, exemptions that were imposed by... And the court said you look across all of those, and if there's any undermining from that interest, then that triggers strict scrutiny. Is that then, and maybe it's just somewhat of a categorization issue, is that more in the, if you grant exemptions for some, you must grant for all type Fulton holding, or is it that Tandon treated religious differently than secular interest? It's both, and Tandon re-emphasized that it doesn't matter if sometimes religion is treated better, sometimes it's treated worse. If there is any distinction where sometimes secular exemptions are given preferential treatment, then that... Where are secular exemptions ever given preferential treatment, either under the K through 5 or the sex ed exemption? Well, you just look at it against the underlying interest, if the interest is promoting inclusivity, you can get secular exemptions from the inclusivity instruction when it is presented in the health class. You can't get religious exemptions from the inclusivity when the instruction is presented during the... But you can't get any exemptions. During the Price Storybooks, right, the school board has tried to say they've banned the exemptions, or the opt-outs entirely, but in reality the religious diversity guidelines continue to allow exemptions from any instruction that would violate the student's or the parent's religious beliefs. So this is just one application, and again, in Lukumi, of course, if you can't carve out just one piece of it and say, well, we've banned opt-outs for the entire case, or for the entire situation, you have to look at everything that implicates the underlying interest. So the retained power of the board to grant exemptions brings you within the exemption framework of cases like Fulton, is that your argument? Well, this would be a different situation if the school board had, in fact, revised its religious diversity guidelines, but they haven't done that. They've just issued a statement saying we're not going to respect the right that's granted by both Maryland law and the religious diversity guidelines. Why do you say that? Fulton talked about, there was exemptions allowed, and then after the fact, the commission, I said, we're not going to grant any more exemptions. That may not have been as formal as changing the policy, but they emphatically said no more exemptions. Why does that not control here, even if they were to have revised the policy? Yes, I agree, Your Honor. If I may, my time has expired, but if I may answer your question. Go ahead. Yeah, I think that's right. I think the question may be different. There might be a little bit of a different consideration if there were an absolute change in the policy, especially in these circumstances. There would still be strict scrutiny because the school board is obviously acting in response to religious objections. We've seen their response in the statements that our clients are white supremacists, xenophobes, that their children are just parroting dogma. Those statements all indicate further reasons why strict scrutiny would apply in this case regardless. Just in closing, I would just note that there are five or six paths here to strict scrutiny, any one of which is alone sufficient, and the school board simply has not met the burden under strict scrutiny of why it should be able to violate our client's religious beliefs. Thank you. So, what's your best guess? How long does it take this to go before it goes to trial? It could be fairly significant, Your Honor, based on the amount of discovery that could be taken. We would argue that the key evidence is already before the court. I understand that. What I asked you was, what's your best guess? How long would it take you to get this case ready for trial? I would assume it would take around a year. Okay. And I just want to be sure I understood one of your earlier answers correctly. There does appear to be a line of cases that opens causes of action for indoctrination, particularly for younger children, and I took an earlier answer of yours to be you're not bringing that claim here. Well, Your Honor, we would. We do think that for children in the formative ages that there is an element of indoctrination here. Mozart and Parker are the only cases that have addressed that, and they didn't affirmatively say that that was the standard. They adopted a direct coercion standard, which is inconsistent with all the Supreme Court cases on this, but we do think that there is an element of indoctrination here, as indicated by the evidence we discussed at 595, 575, and 600 of the appendix. All right. So, you have to prove that there's some burden first, you would agree, right, before we even get into, because you've jumped to strict scrutiny, and we haven't, you haven't discussed the coercion, direct or indirect coercion, that establishes this burden upon religion, your client's religion. So, just three quick points on that, Your Honor. First, under Yoder, Yoder involved a case that was exposure to worldly values that violated the beliefs of the Amish, and of course that was a sufficient burden to trigger strict scrutiny. We see no basis for there is substantial pressure on our clients to violate their religious beliefs to access the benefit of public education. Grace Morrison, at document 49 of this court's docket, has said that she's had to pull her child, who has Down syndrome and ADD, from a public school at the cost of $25,000 because of the special services that have to be made up. And all of our clients are questioning whether they can, you know, they often have two working parents, they can't homeschool, they can't the, and then third, the cases developed after Smith that deal with neutrality and general applicability hold that the disparate treatment is itself a burden. In fact, in Carson versus Macon, the court said that that distinctive treatment is odious to our constitution, and we think any of those paths would trigger strict scrutiny, which is a standard that the school board has failed to meet. All right, thank you very much. You have some rebuttal time. We'll now hear from Mr. Schoenfeld. Thank you very much, your honor. The district court drew on an unbroken line of precedent holding that parents who enroll their children in public schools do not have a free exercise right to line-item veto elements of the curriculum that contradict their religious beliefs. This court's analysis can stop there. When you say line-item veto, my understanding of the plaintiff's case is that they're not seeking to get the school board to change its curriculum, they just want to go back to the opt-out. I do think that's their submission. I think the distinction is between what was permissible in Yoder, which was permissible in Pierce versus Society of Sisters, which is to opt out of the public school system in favor of parochial education or homeschooling or anything else, rather than having the ability to decide which elements of the curriculum the school, the parents can pick and choose from. Right, but they say here there's a religious burden, which we have lots and lots of cases that say that's a pretty significant concern, and then they turn to scrutiny after that. So it seems like to me that what you say is correct, but it doesn't say much about the burden question. Sure, so I think there is an unbroken line of cases, including, as Your Honor, Judge Bottlebaum pointed out, Mozart and Fleischfresser and Parker, which says that near exposure to offensive material in a public school doesn't constitute a constitutionally cognizable burden on parents' free exercise rights. With all respect to Mr. Baxter, I think he misstates the record in terms of what the texts actually are and what they do, especially starting at the earliest stages. They are simply the inclusion of LGBT characters in text that is meant to be used either for read-alouds or on the shelf in the classroom among all of the texts included in the curriculum for pre-K. Help me a little bit on the context. I'm looking now, say, at K and pre-K. So is there something similar for reading comprehension in that age group that, for instance, deals with the nation's founding? I can't tell you everything that's in the curriculum. I assume so. I have two young kids. They have all been exposed to texts relating to that. The point of introducing these books is that before the introduction of these books, a survey was done of curriculum. What about veterans, the sacrifice of veterans over all these years? Any part of that imputed to these three- and four-year-olds? I assume, especially around Veterans Day, there is curriculum. I can't tell you exactly what's included. There are families in books that are read between pre-K and five. There are young children. And the point of the introduction of these texts is that prior to the introduction... Right. And they're three- and four-years-old. Correct. And courts have said repeatedly that's a significant factor because they are very influenceable. Absolutely. But there are three- and four-year-olds in Montgomery County schools who have gay parents. And prior to the introduction of these texts, they didn't see their parents, and they didn't see their families in these texts. So, counsel, I accept that, and I think the positions of the reasons for the readings make that point. But accepting that, and even accepting that as a valid basis for using these texts, don't you still have to deal with the fact that if the reasons for doing that cause a violation of the free exercise clause, there needs to be an accommodation of that? Sure. So let me answer that question in two ways. First, I just want to tie off the burden question. Exposure to the existence of LGBT people and LGBT families through these texts is not a constitutionally cognizable burden. Parker and Moser both made clear that there's a range of exposure, even at the earliest grades. Parker was also about elementary and kindergarteners. First of all, I'll let you finish, and I think that's fair to talk about Parker and Moser in terms of exposure that way. Related to that, those aren't our circuit, and they're not the Supreme Court, and the Supreme Courts, particularly in Fulton and other cases before that, seem to say that if a policy requires the choice between actions that are part of the exercise of religion and obtaining a benefit, that's a burden. And I know these plans say their religion is such that what it means to be a male or a female and issues of marriage and romantic relationships are matters for them and their church. Yeah, absolutely, and I think the same argument was made in Moser and Parker, and to your point, Judge Quattle-Down, those cases followed Sherbert versus Verner, which said that the compulsion to choose between a religious observation and receipt of a valuable government benefit was impermissible. And what they said in those cases is that once you choose to send your child to a public school, that's a choice you have to make at that point under Pierce versus Society of Sisters and Yoder. But once you make the decision to send your children to public schools, part of the compromise in sending your children to public schools is that they may be contradictory to your religious beliefs, and that doesn't constitute a constitutionally cognizable burden. Well, that's a different proposition than if the state affirmatively attempts to change the young child's views. I agree entirely. So let me finish. So there's language. I can't verify whether it's accurate or not, but apparently the teachers are instructed to disrupt the either-or thinking in several places. And the principals shared concerns, which included that the curriculum was dismissive of religious beliefs, and some of the responses were shaming comments to a child. So is a parent to have no recourse other than withdrawing their child from school, if that's the position of the state? So, with all respect, Your Honor, I think that misstates what's in the record. I would point, Your Honor, to page 602 of the guidance from the school district, which says explicitly, no child who does not agree with or understand another student's gender expression or their sexual identity is asked to change how they feel about it. The comments Your Honor pointed to were not about the curriculum, but were about principals' response to sample Q&A that teachers could use. What about the teacher's suggested responses when the child asks about the curriculum? That's what I'm referring to. So I think those are not about the text. Those are sample Q&A. There's no evidence in the record that they're ever used. But even as to those, I forget which the principals commented on it potentially being dismissive of religion, is one where a student says, you can't be a boy if you were born a girl. That's weird. And the teacher is meant to respond, that's hurtful. You shouldn't say that. That has nothing to do with anyone's religious belief. That has nothing to do with disparaging a particular view of gender identity or sexual orientation. I think we can all agree that an elementary school student describing a fellow classmate as weird is hurtful, and that ought to be corrected in the name of civility. None of this is meant to indoctrinate children along a particular view. I think Parker's instructive on this point, and so is Tatel, the case that plaintiffs rely on. In Parker, the court said, merely including books that advert to or discuss the existence of families headed by same-sex couples is not coercion. It's exactly what Barnett said was permissible. There may be a world in which students are exposed to only that text day after day, and coercive classroom instruction, and that crosses the line into indoctrination. That's not remotely what we have here. But do we have to have, I accept the point, we could differ maybe about what the record shows, and whether it's exposure versus an effort to influence one's belief. A lot of people would say it's kind of hard to imagine a kindergartner changing their beliefs. That seems like a concept that's talking about older children rather than people that age. But put all that aside, let's say you could debate whether it's exposure, you could debate whether it's attempting to influence. Isn't the choice, it looks to me like the Supreme Court, in particular the recent decisions, are saying if you're asking someone to choose to act in a way that's contrary to their religious beliefs in order to obtain the benefit of a public education, that's a burden. Then we look at the issue of neutrality and general applicability. It seems to me once you go there, you know, when you started with a policy that allowed exemptions, and then you decided, the school district decided to eliminate that, that's the type of exception and elimination of exception that Fulton says you just can't do. So let me bracket the burden question. I take your point, Judge Qualam, I think we've sort of exhausted the discussion on burden, and I think you're right analytically that we now proceed to the standard of review. So let's sort of assume for a moment that plaintiffs have shown a burden, though I'll just reiterate. We're not asking for a concession, we understand you disagree with it. I understand. I think the point is that all of those cases, Moser, Fleish, Resser, Parker, addressed exactly the scenario you're talking about. They all talk about Sherbert versus Verner and Yoder and they distinguish them. I agree. Go ahead. And I don't think Fulton says anything different on that point. In other words, that the foregoing a valuable government benefit is a way of coercing someone into a particular religious view. So I think all the cases are consistent with that. You're now into the question of whether this is generally applicable and facially neutral, and I think under Tandon and under Fulton and under Masterpiece, it is. So to start with Tandon, and I forget which of us had the exchange with Mr. Baxter, but to start with Tandon, the question is whether you identify any comparable secular activity that's being treated better than religious activity, and they haven't done that here for exactly the reason that the colic we revealed. There are no exemptions available for the healthy life curriculum. There are no exemptions or opt-outs available for the ELA curriculum. Those are treated exactly the same way. So for their argument on that to prevail, is it your view in effect they would have to show that the two curriculums are essentially in pairing material? I think they have to show that there's some similarity between them that is justified. Well, first off, I think they need to show some disparate treatment between secular and religious activity. They fell at the starting gate there. In Tandon, the court said you've got a prohibition on congregate gatherings of three or more families at home for religious purposes, but you allow people to convene in movie theaters and barber shops. That was secular activity that the Supreme Court majority said was comparable to the religious activity that was not permitted. That's not what you have here. What you have here is no ability to opt out for any reason from the ELA curriculum. So is there a deficit at this point then, a lack of evidence? No, I think it's just on the face of the policy, there is a secular activity that is being treated better. I think when you have something that treats religious and secular activity the same, it's very hard to find the relevant comparator for something that treats secular activity better. I understand your point. I think it was me who was questioning Mr. Baxter about the SEC said on that. I understand his response. I understand, I think, your position on that. But it seems to me there are two other issues you have to deal with. And one is the discretion exception issues that Fulton talks about. And then the other is, even if you don't have an express different treatment of secular and religious interests, you have hostile evidence of hostility from which you can apply that. And let's deal with those two things. Maybe start with the Fulton and discretion, because I'm having trouble with your argument there. Sure, so absolutely. And I think the two categories you've identified graph nicely onto Fulton and Masterpiece. So what Fulton says is impermissible is a system of discretionary exemptions that requires the decision maker to make a normative evaluation about whether the justification is good enough. That's the language of Sherbert that Fulton carries forward. Do you have a system in place that requires the decision maker, whoever is approving the exemptions, to say, is this rationale good enough? And it allows for a situation where the decision maker will say, this religious belief is not sincerely held. It doesn't actually require this. It's not required. I don't see Fulton really dealing with the issue of whether it's a sincere belief. It seems to me, and I think Sherbert talks about that, and Smith says, you can't do that. Courts aren't equipped and shouldn't be in the business of saying how sincere one's religious belief is. Certainly Fulton has the language about that if it is not comprehensible or reasonable to someone, and maybe that's what you're talking about. But when it gets to the discussion about whether you grant exceptions, and clearly the original policy granted exceptions, and then it took it away based on its determination that it was too cumbersome or burdensome for it. I don't see how Fulton doesn't cover that. Sure. So the language of Fulton is a system for exemptions is impermissible when it, quote, invites the government to consider the particular reasons for conduct. And that's what I was trying to get at. And the same thing is true in Sherbert, right? The question in Sherbert was, have you shown good cause? And it invited the decision maker to figure out whether a particular religious objection to working on the Sabbath was good cause. Fulton doesn't say, or Fulton does say that what is impermissible in a regime that allows for exemptions or opt-outs is a requirement that the decision maker weigh, make a normative judgment, that's the language of Fulton, about whether the rationale for the exemption is worthwhile. And I think Judge Richardson's concurrence in this decision in Canaan Christian makes that exactly clear. What he says is the problem under Fulton is whether the decision maker needs to figure out whether a rationale is good enough. And there's none of that here. There's no basis on which a decision maker within the school system is deciding whether the rationale for a requested exemption is good enough. Every exemption is granted for the health education curriculum. No exemption is granted for the religious, for the ELA curriculum. Well, that's not, that's, that's, on that last point, that's now the case after objections or opt-out requests had been made. I don't, I don't know that that gets you there if the original policy was not that. Well, the original policy was to allow opt-outs. Well, it was not. It was to allow it unless to the extent the board found it feasible and reasonable. It was, there was discretion built into that to begin with. But under that policy, there was still no judgment being made as to whether a particular rationale for an opt-out was valid or invalid. Well, it may be. I mean, as I recall, it had language like the reasonableness of the request. I think it did. I mean, I think those sort of normative things were built into that original policy. So, I don't think, I think you're talking about the religious guidelines. Those don't use the language of reasonable. They say that all religious opt-outs will be made available unless the decision is made that they become too frequent or too burdensome. But Judge Quattlebaum, regardless of what... So, that's, that's what happened here, that there were just too many of them? Correct. That they, there was, it was leading to high absenteeism and that it was leading to disruption in the classroom. And those are... Do you know how many? Because I'm not sure the record is clear. I don't think the record specifies exactly how many. The Hazel Declaration, paragraphs 33 and 34 talk about a high number of opt-outs, concerns about absenteeism, and concerns about the administrative burden of managing the opt-outs and coordinating with media specialists. Of course, that's only relevant if we're at strict scrutiny. And so, just to... I think you're right, by the way. I went and checked. The reasonable and feasible is the accommodations, not the request. I think that's right. It's sort of the length of accommodations when someone's absent. But Judge Quattlebaum, more importantly, the guidelines include this language about whether specific opt-outs will be honored for religious purposes unless they become too frequent or too burdensome. But the record is clear that prior to the change on March 22nd, opt-outs were being honored for any reason. You didn't need to say it was for a religious reason. It could have been for a purely secular reason. All of those opt-outs were honored. That may be true, but I'm not sure that that matters if the policy gives the school district discretion over whether to grant the opt-outs. They may have exercised it in a way that was generous before, and now they've exercised it in a way that's not. The question is whether it's up to you to accommodate or decide whether this time we're going to allow them to exercise their religion and next time you're not. Sure. So let me try to answer that question in a couple of different ways. Opt-outs are not required. They're part of the play in the joints between the establishment clause and the free exercise clause. So the only question is whether you are applying them in an even-handed way. The existence of discretion in a policy is not what triggers scrutiny under Fulton. It's the requirement that there be a normative evaluation and this was the case in Fulton that it was up to a sole discretionary decision maker who could use whatever criteria he wanted to decide whether the rationale was good or not. That's not the case here, and there's no evidence in the record that it's been applied in any disparate or discrepant way. To the contrary, everyone agrees that before March 22nd, everyone was being given opt-outs no matter the reason. Everyone agrees that after that point in mere withdrawal of a previously available religious opt-out doesn't by itself constitute any kind of impermissible religious animus. To the contrary, Justice Gorsuch said in Youngblood, a contrary rule just sort of freezes in place every accommodation a government tries to grant in order to sort of exploit the play in the joints between the establishment clause. So that fact standing alone doesn't prove anything about the fact that this policy was not generally applicable or facially neutral. Well there's some, this is moving to a slightly different topic, and they had a couple extra minutes, you're going to get a couple extra minutes. So there's some pretty strong language that the plaintiffs say was used here. Another reason to hate another person, dehumanizing form of erasure, ignorance and hate does exist in our That's pretty strong language. And I thought, gosh, I've heard stuff like that before, and it's not that different from what the Supreme Court recited in Masterpiece Cake. So do they have a Masterpiece Cake claim here? I don't think so. And Judge Agee, I would encourage you, we tried to be very careful in parsing exactly where that language came from and what context in our brief. For example, one of the things you quoted is not from the school board at all. It's from a letter by concerned authors to Congress that's just part of the record, but it's not imputed to any board member. Every comment at the plaintiff's site about board deliberations of this made clear that they object, that the one board member, board member Harris, objects to the inclusion of an opt-out remedy for any reason at all. And one of the comments you gave, for example, is it doesn't matter whether it's religious belief or xenophobia or any other reason, I don't believe that opt-out should be permitted. Saying that you don't favor any opt-out is not tantamount to what's impermissible in Masterpiece. In Masterpiece, the court said that anything that passes judgment upon or presupposes the illegitimacy of religious belief is impermissible. And nothing like that is alleged here. A policy making body rescinded an opt-out policy and now prohibits opt-outs for any reason. I guess their claim would be that the commentary, assuming they could prove it, shows the hostility of the decision maker. I don't agree it shows hostility. I didn't say that it did. I mean, they've got to prove that. But if it did show the hostility of the decision maker, then that would seem to undergird a Masterpiece K claim. Again, I think for the reasons we gave in our brief, and I'm happy to delve into them more, just mindful of the time, the comments here are categorically different. And I also think the brief of the ACLU of Maryland compares them in meaningful ways. There's no commentary about anyone's religious belief in any of the comments that they point to. In contrast to Masterpiece K shop, where they said freedom of religion or religion has been used to justify all kinds of discrimination throughout history, whether it be slavery, et cetera. And they specifically said religious belief has no place in the public sphere. Every comment the court seized on in Masterpiece K shop was specifically about the baker's personal particular religious beliefs. There is none of that here. It is all oriented towards the policy and whether the school board is going to allow any exemptions at all. I'd also note, just given the procedural posture here, if there is a question about whether Masterpiece K shop applies here and whether it triggers strict about whether these comments rise to the level of Masterpiece K shop, the remedy, of course, is not to grant an injunction. Instead, it's to remand with instructions from this court for discovery and trial. But they certainly haven't demonstrated a clear entitlement to relief on the record as you've described it, Judge Agee. Counsel, one last question for me. Hypothetically, if we're in a strict world after students for a free admission, what's your best argument that you survive strict scrutiny? I'm not suggesting we're there. There are a lot of issues you've raised and argued and briefed. Well, I'm just trying to say if we are there, is there any argument you have after that case that you survive strict scrutiny? Yeah, absolutely. So I think what SFFA said is rationales like diversity are too sort of theoretical to justify a compelling interest. If we were in a universe where we had to justify under strict scrutiny the inclusion of the LGBT texts, I might be in trouble under SFFA. But that's not where we are. We need to justify under a compelling interest the unavailability of an opt-out policy. And the rationales for that are the safety of students, the continuity of classrooms, the ability to ensure that classrooms are conducted in an undisrupted and safe manner. SFFA says nothing about those rationales. Absenteeism, the inadministrability of the opt-out system for curricular texts that are seamlessly integrated through the curriculum, that all goes to the traditional prerogative of schools to manage the school day. And that's a compelling interest under the Supreme Court's decision. I know there are cases that talk about managing. I get that that's a countervailing interest. I question whether the deference, maybe I'm wrong here, is there a case that says the deference we afford to schools to determine curriculum survives strict scrutiny? And as you mentioned, in Bolton, there was an argument about deference, not in the school context, but the government's management of its affairs. And the Bolton court was pretty clear that, hey, deference doesn't get you past strict scrutiny. Sure, and I'm not asking for deference here. I think the point, to answer your question directly, is schools have a compelling interest in making sure that they can conduct the school day undisrupted and conducive to a learning environment. I think that's the compelling interest that's been well established. And SFFA, in its commentary on the diversity rationale, I don't think undermines or disturbs that. The point here is not a compelling interest of inclusiveness in the text. That might justify the inclusion of the books, which is not being challenged. The question is the availability of the opt-out. And the compelling interest there is maintaining a safe, undisrupted school day for students, which I think the showing of the district demonstrates they tried and failed when they allowed for opt-outs. Well, you know, if that many parents were opting out, some people might consider the problem the board's and not theirs. Your Honor, it's a good point. Here's what I'll say. The Supreme Court and the Courts of Appeals have a very difficult job, as do public schools, in toeing the line between free exercise concerns and managing a diverse, ecumenical school system. And school districts have to be given some latitude to make hard decisions all the time. I'm not conceding they made the wrong decision here, but the federal reporter is littered with challenges to decisions that school boards make. The way that courts have traditionally safeguarded their own prerogative, which the Supreme Court has repeatedly recognized doesn't go into the management of day-to-day school affairs while allowing free exercise rights on the parent's side, is to say that mere exposure to offensive materials doesn't violate constitutional rights. That once you enroll your children in public schools, you have to recognize that they may be exposed to this material. The school board may have made the wrong decision here. Maybe they should not have introduced the LGBT curriculum. School board members are voted out all the time for making those decisions. Again, I don't think that's the case here, just answering your question directly. I understand. That's a remedy that's available to people, but that's part of democratic local control over school decision making. It doesn't mean that you constitutionalize a parent's right to object and opt out to curriculum. All right, thank you for that. We've asked you a lot of questions. If you wanted, I'll give you an additional 30 seconds to wrap up. I think I've taken enough of the court's time. All right, thank you very much. Okay, Mr. Baxter, you've got rebuttal. Thank you, your honors. First, the school board portrays this case as one about mere exposure to different lifestyles. If that were true, there might not be as many parental objections. This curriculum, teachers are told to tell students that are three and four years old that doctors guessed at their sex when they were born. They should explore for themselves what their sex is and what their pronouns should be. But isn't it, I think the call-ins, the policy says that these are just suggestions. These are not, there's nothing mandatory about the teachers, given these are just suggested answers. These are just answers that the school board gave to teachers, particularly in response to parents' objections. We know from, for example, from the NEA brief that teachers are saying they want to do even more in these situations. These suggestions are things like there's no right way to think about these issues, which our clients think there is a right way according to their religious beliefs. There is, if the principals themselves found that these books were inappropriate, that they were coercive, that they were shaming to students and dismissive of their religious beliefs. That's at 595 in the record. The principals, the parents have all gotten the message that this is an effort. Now if, and counsel themselves, if there's no intention to change students' beliefs or indoctrinate them, then why is there not even notice given here? At 602, the school board said you can always be notified and just keep your schools home with an unexcused absence. Here you can't even have that now because the school board has said they won't even give you notice. So there's no question there is substantial pressure here. The school board says, well, once you choose to use the public schools, that's the end of your choice. But that was the same argument that was made in the Fulton case. Once you choose to enter into a government contract, you no longer have a free exercise right. And the Supreme Court rejected that decision and said, no, the mere pressure to curtail your mission in order to obtain a Counsel, what, is there, I mean, if the burden is simply a choice and the courts, you know, aren't able and, you know, aren't equipped to really evaluate the sincerity or the centrality of the position. I mean, how do we avoid the situation then that we're, you know, getting in the business of, you know, granting opt-outs on any book that might have objectionable material? A couple of notes. First of all, your honor, the board's policy already allows those kinds of opt-outs for any book that might have objectionable material based on a student or We haven't seen a flood of cases until we had a highly objectionable curriculum. I would also note that, you know, in Yoder, it was the mere exposure alone. There weren't all of these other factors. And we have several limiting factors here. One is sincerity. We think the court can test sincerity. It can't test centrality, but it can question sincerity. We're also looking at limits, for example, cases like Smith v. Ricci in New Jersey gathers a number of cases. That's at one that says the limit is an opt-out to a specific curriculum. And once that's met, then the obligation is satisfied. And in this case, the court could also limit it to the fact that there is a national consensus. States across the country require opt-outs or opt-ins on these types of issues. And, you know, the Supreme Court in Holt v. Hobbs says that where you have a nationwide consensus like that, then the school board has an even higher burden to show why it can't allow that here. The school board, on the other hand, has no limit. The school board says once you put your children in public school, you have no right to pull them out or to be notified of anything that your child is taught. It could be... So they're the ones that have no limit to the right here. We're asking for a very narrow remedy that tracks what the school board has always allowed. Does the... I think when you were speaking earlier, does the difference in this case, and maybe Parker, even though it went against you, where the texts are part of a program, you know, that has expressed goals as opposed to an objectionable book that's not pursuant to a policy like that. Is that an appropriate limiting principle or dividing line? I agree that is another way that those cases can be distinguished, but I think under Yoder, the court simply relied on exposure to a viewpoint about... If you're not talking Yoder, you're talking about Smith, Bolton, Kennedy. That's... Is that something that makes sense under that rubric? I think that, yes, that is another limiting factor that those cases did not involve the obvious, the intentional, explicitly intentional effort to disrupt students' thinking. Yoder has... I mean, if it's the law, it's the law. So, I mean, limiting principles are interesting to talk about, but we follow the law, but Yoder really has none. Would you agree with that? I mean, if it's a religious belief and it involves the right of parents to, you know, to rear their children, there's not a whole lot of limiting principle there, is there? If this is a broad right, there are limiting principles. Sincerity, the court also said that really you're looking at are the parents doing something that would either physically hurt the child or impair their ability to become functioning adults, then you would have a situation where strict scrutiny would be satisfied. But yes, we do think there is a, you know, the exposure can already recognize that they've been doing that for years. So are you, I just wanted to be clear, are you making, as part of your overall case, are you making a masterpiece cake argument? Yes, Your Honor, we have made a masterpiece cake argument. We think that if the court has any doubt about the burden, then masterpiece allows the court, especially on the preliminary injunction stage where there's that kind of evidence, to allow the opt-out right to remain in place while the case is fully heard. I would also note under Tandon, Your Honor, the issue about, you know, all opt-outs are banned for the Pride storybooks. In Tandon, all gatherings of three or more unrelated persons in a home were banned, regardless of whether it was for religious reasons. And the court rejected that and said, well, the fact that you can go to, in groups of three, to a store is an exception. So this idea that you can carve out one area and say, well, it's banned entirely in this area, it doesn't suffice. You have to show that the entire interest is upheld. All right, we're pretty liberal with time today, so I'll give you another 30 seconds or so to sum up if you want it. Thank you, Your Honor. I would just close with the school board says the play in the joints is a play here, but the recent Supreme Court cases have indicated that the free exercise clause and the establishment clause work together. And if you look at cases like Lee versus Wiseman and Edwards versus Aguilar, in those cases also, the mere presence of children was sufficient to trigger protection under the Constitution. And that protection should extend under the free exercise clause. All right, thank you very much. We appreciate the variable arguments of counsel, and we're now going to come down and greet counsel and then go to our next case.
judges: G. Steven Agee, A. Marvin Quattlebaum Jr., DeAndrea Gist Benjamin